IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEN BAGLEY | : | CIVIL ACTION |
| | : | |
| v. | : | No. 23-1747 |
| | : | |
| UPPER DARBY TOWNSHIP and JOHN | : | |
| DOE DEFENDANTS NOS. 1-10 | : | |

**MEMORANDUM**

**Judge Juan R. Sánchez**                                                                                                     **August 6, 2024**

      Plaintiff Len Bagley brings this civil rights suit pursuant to 42 U.S.C. § 1983 against Defendants Upper Darby Township and various John Does, alleging the response to his complaints regarding a neighbor dispute constituted unequal treatment on account of his race and ethnicity. Upper Darby moves for summary judgment, arguing Bagley has produced no evidence showing it violated his Fourteenth Amendment equal protection rights due to a municipal policy or custom. Because Bagley has not shown an Upper Darby policy or custom violated his Fourteenth Amendment rights, the Court will grant Upper Darby's motion for summary judgment.

**BACKGROUND**

      In May 2021, Plaintiff Len Bagley, an African American man, began having confrontations about parking with his Caucasian neighbor, Michael Laputka.[1] Def.'s Statement Facts ¶ 8, ECF No. 25-1. Laputka would block Bagley's driveway, park illegally, and shine his truck headlights into Bagley's backyard. Ex. B (Upper Darby Police Department Incident Reports) 1-2 (ECF pagination), ECF No. 25-3. When Bagley confronted Laputka, he responded with threats, slurs, and profanities. *Id.* at 1-5. Bagley repeatedly complained to the Upper Darby Police Department

---

[1] The Second Amended Complaint ("SAC") incorrectly identified Laputka as "Laputnik." Def.'s Statement Facts ¶ 8.

("UDPD") about Laputka's behavior. *Id*. at 1-2. UDPD officers advised Laputka to stop the offensive conduct numerous times, but he continued to park illegally and verbally abuse Bagley. *Id*. at 6-7.

The disputes with Laputka culminated in a physical altercation on August 26, 2021.[2] Def.'s Statement Facts ¶ 12. Laputka sprayed Bagley in the face with Freon, a chemical substance, before Bagley punched Laputka. Pl.'s Statement Facts ¶ 12, ECF No. 26-1. The police arrived and initially planned to detain Bagley. Def.'s Statement Facts ¶ 14. But once Bagley provided video of the altercation, the police issued citations to both men for harassment. *Id*. ¶ 11; Pl.'s Statement Facts ¶ 14.

In total, the UDPD responded to altercations between Bagley and Laputka 32 times between May 2021 and August 2023. Def.'s Statement Facts ¶ 9. Bagley was the complaining party in most of the incidents. *Id* ¶ 10. UDPD advised Bagley of his "options to file a private criminal complaint for harassment and a civil suit," and gave him the phone number for the Ethnic Intimidation Unit. UDPD Incident Reps. 6; Pl.'s Dep. 193:2-15, ECF No. 25-4.

During this time period, Bagley also had disagreements with Upper Darby code enforcement. At one point, Bagley attached a tarp to his backyard fence to block light from Laputka's house. Pl.'s Dep. 21:13-17. The Upper Darby Zoning Hearing Board forced him to modify the tarp's placement after Clare Coppa, a Caucasian neighbor, complained because it blocked her view of the road. Def.'s Statement Facts ¶¶ 21, 25. Bagley dealt with multiple code enforcement officers, including Joshua Chast, Daniel Knowles, and an officer named "Sean." Pl.'s Dep. 23:7-10; SAC ¶ 47, ECF No. 14.

---

[2] The SAC mistakenly asserted this altercation occurred in September 2022. Def.'s Statement Facts ¶ 12.

On May 5, 2023, Bagley filed suit against Upper Darby and John Doe Defendants 1-10 for "a pattern or practice of differential treatment" in responding to his complaints, issuing citations, and enforcing codes. SAC ¶ 32. After this Court adjudicated two motions to dismiss, the case proceeded to discovery with Upper Darby and John Doe Defendants 1-10 as the remaining defendants. *See* ECF Nos. 12, 19. Upper Darby now moves for summary judgment.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) authorizes a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id*. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. When considering a motion for summary judgment, the Court must "view all facts in the light most favorable to the non-moving party and draw all inferences in that party's favor." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citation omitted). Viewing the facts in this light, summary judgment must be denied if a reasonable jury could find for the nonmoving party. *Anderson*, 477 U.S. at 248.

**DISCUSSION**

Bagley brings this action pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), contending he experienced unequal treatment

3

due to his race and ethnicity in violation of his Fourteenth Amendment rights. SAC ¶¶ 52-57.[3] Specifically, he claims Upper Darby ignored his complaints because he is African American, but responded to his Caucasian neighbors' complaints and issued unwarranted citations to Bagley. *Id.* ¶ 32. Upper Darby moves for summary judgment, arguing Bagley has not established any violation of his constitutional rights due to an Upper Darby policy or custom. Def.'s Mem. Law 4-6, ECF No. 25-7. Because Bagley has not shown an Upper Darby policy or custom violated his Fourteenth Amendment rights, the motion for summary judgment will be granted.

To succeed in a § 1983 action, a plaintiff must show "a deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (citation omitted). Bagley alleges violations of the Equal Protection Clause of the Fourteenth Amendment. SAC ¶¶ 55-57. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted).

Although not explicitly stated by Bagley, the Court understands him to bring a selective enforcement claim under the Equal Protection Clause.[4] To state a selective enforcement claim, a

---

[3] The SAC also vaguely alleges violations of the Fourth Amendment. *See* SAC ¶ 54. Bagley has seemingly abandoned this argument, as he has not identified or explained how Upper Darby violated his Fourth Amendment rights in any subsequent pleading. *See, e.g.*, Pl.'s Opp'n Summ. J. 8-12 (ECF pagination), ECF No. 26-1 (focusing solely on allegations of disparate treatment and equal protection caselaw). As such, the Court only considers his Fourteenth Amendment claim. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.").

[4] In a selective enforcement claim, a plaintiff contends "he was treated differently because of his race." *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020). Bagley's SAC and other filings do

plaintiff must show he was "(1) treated differently from other, similarly situated persons and (2) that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor or to prevent the exercise of a fundamental right." *Harvard*, 973 F.3d at 205 (citation and internal quotation marks omitted). Persons are similarly situated when they are alike "in all relevant aspects." *Id*. (citation omitted). An equal protection selective enforcement claim requires "evidence of discriminatory purpose, not mere unequal treatment or adverse effect." *Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012) (citation omitted).

Because Bagley sues Upper Darby, a municipality, he must also show the alleged constitutional violation resulted from an Upper Darby policy or custom. A municipality cannot be held liable "for the unconstitutional acts of its employees just because of their employment, under a *respondeat superior* theory." *Johnson v. City of Phila.*, 975 F.3d 394, 403 (3d Cir. 2020) (citing *Monell*, 436 U.S. at 691). Instead, a municipality may be liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [an] injury"—that is, violates a constitutional right. *Monell*, 436 U.S. at 694. Thus, if alleging a policy, a plaintiff "must point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the

---

not explicitly state he is bringing a selective enforcement claim, but he asserts Upper Darby "engaged in a pattern or practice of differential treatment of [him] due to his race and ethnicity" by strictly enforcing rules against him while "leniently overlook[ing]" the same rules for his Caucasian neighbors. SAC ¶¶ 32, 41. He also claims Upper Darby "keenly" investigated complaints against him but not against his Caucasian neighbors. *Id*. ¶ 42. His response in opposition further relies extensively on a Third Circuit case examining an equal protection selective enforcement claim. *See* Pl.'s Opp'n Summ. J. 8-12. The Court thus construes Bagley's allegations as bringing an equal protection selective enforcement claim "under a traditional theory, which protects a plaintiff from discriminatory treatment based on membership in a protected class"—i.e., his race. *Patterson v. Strippoli*, 639 F. App'x 137, 142 (3d Cir. 2016) (citation omitted).

relevant subject." *Forrest*, 930 F.3d at 105. The policy "need not be passed by a legislative body, or even be in writing, to constitute an official policy for the purposes of § 1983." *Porter v. City of Phila.*, 975 F.3d 374, 383 (3d Cir. 2020); *see also Brown v. City of Pittsburgh*, 586 F.3d 263, 293 n.37 (3d Cir. 2009). And if alleging a custom, the plaintiff "must evince a given course of conduct so well-settled and permanent as to virtually constitute law." *Forrest*, 930 F.3d at 106 (citation omitted). A custom not formally approved can still result in liability when the relevant conduct is so widespread as to have "the force of law." *Monell*, 436 U.S. at 691 (citation omitted).

With respect to selective enforcement claims and establishing a municipal policy or custom, a plaintiff may rely "primarily on incidents of discriminatory enforcement as circumstantial evidence of a municipal policy or custom." *Brown*, 586 F.3d at 293 n.37. But such circumstantial evidence requires "proof of a pattern." *Id*. And no matter the type of evidence offered, the plaintiff must show the "decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." *Jewish Home*, 693 F.3d at 363 (citation omitted).

In sum, Bagley must show (1) he was treated differently because of his race, and (2) this differential treatment occurred because of an Upper Darby policy or custom. But before the Court turns to the Motion for Summary Judgment, the Court notes Bagley relies almost exclusively on evidence which is not in the record.[5] Although he references videos and photos pertaining to this

---

[5] Specifically, in arguing material facts are in dispute, Bagley repeatedly references sending "hundreds of videos and photos" to the Delaware County District Attorney's Office, Upper Darby code enforcement officers Joshua Chast and Daniel Knowles, and "Defendant's agents" over the past two years. Pl.'s Statement Facts ¶ 28; SAC ¶ 18; Pl.'s Opp'n Summ. J. 7; Pl.'s Dep. 23:7-13. Further, he represents that he already sent "any and/all documentation, video, photo, or evidence pertaining to this case" to Upper Darby. Pl.'s Statement Facts ¶¶ 29-30. Tellingly, these videos and photos are not described as evidence of any Upper Darby conduct, but of his neighbor Laputka "violating the law, ordinances, and the Township's code." Pl.'s Opp'n Summ. J. 7. Additionally, the Court notes Bagley does not specify whether he sent the materials prior to or following the

case, without the underlying materials, these references cannot support his claim. *See Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 328 (3d Cir. 2016) (citations omitted) ("[C]onjecture and speculation will not create a genuine issue of material fact sufficient to withstand the grant of summary judgment."); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record[.]"). The Court will view all facts in the light most favorable to Bagley, but determining whether a genuine issue of material fact exists based on unseen photos and videos is necessarily speculative. This unavailable evidence will not be considered.

The Court now turns to consideration of Bagley's Fourteenth Amendment *Monell* claim. Upper Darby argues there is no evidence of any violation of Bagley's constitutional rights, much less due to an Upper Darby policy or custom. Def.'s Mem. Law 4-6. Meanwhile, Bagley points to an array of incidents which he claims show Upper Darby's "pattern or practice of differential treatment of [him] due to his race and ethnicity." SAC ¶ 32. The numerous incidents can be broadly grouped into two categories: (1) incidents involving altercations with Laputka, and (2) incidents involving code enforcement. The Court begins its analysis with the incidents involving altercations with Laputka. The primary incident is their physical altercation on August 26, 2021, when Laputka sprayed Bagley in the face and Bagley punched Laputka. Pl.'s Statement Facts ¶ 12. The parties agree the police arrived and issued citations for harassment to both men. *Id*. ¶¶ 11-12. This is confirmed by the UDPD incident report, which concludes "[i]t appears that both subjects were at

---

filing of this case. And he does not dispute failing to provide initial disclosures or respond to Upper Darby's discovery requests. Def.'s Mem. Law 6. Even if Bagley sent the pertinent videos and photos to various "agents" of Upper Darby, it is unclear why he could not provide the materials again in discovery for this matter.

fault and both participated equally. Ci[t]ations will be filed to both subjects fo[r] harassment." UDPD Incident Reps. 13.

Bagley has not shown Upper Darby treated him differently from Laputka, who received the same punishment. Bagley argues the police initially "took [Laputka]'s side" and assumed Bagley was the "bad guy." SAC ¶ 21; Pl.'s Statement Facts ¶ 14. But in his deposition, Bagley clarifies an officer explained the police "came straight to [Bagley] because [Laputka] had a head wound that was bleeding." Pl.'s Dep. 45:5-8. In other words, the police initially took Laputka's side because of his bleeding headwound—not because of Bagley's race. And though Bagley suggests Upper Darby violated his rights by issuing him a citation even though Laputka started the fight, he has not identified any other person who did not receive a citation after involvement in a fight, regardless of who instigated the fight.[6] This failure to identify a comparator is fatal to his equal protection selective enforcement claim. *See Harvard*, 973 F.3d at 205 (explaining a selective enforcement claim must demonstrate the plaintiff was "treated differently from other, similarly situated persons").

The remaining incidents involving Laputka also do not demonstrate selective enforcement. Bagley claims Upper Darby has a long pattern of "completely" ignoring his complaints about Laputka. Pl.'s Opp'n Summ. J. 7. Yet he concedes the UDPD responded to incidents between him and Laputka 32 times, and that Bagley was the complaining party in most of those incidents. Pl.'s Statement Facts ¶¶ 9-10. The incident reports likewise show the UDPD responded to his

---

[6] Bagley also states he called the police before the altercation because Laputka blocked his driveway, but no one responded to his call. Pl.'s Dep. 43:21-44:9. Conversely, the police responded once Laputka called and reported the altercation. *Id*. To the extent Bagley argues this different response is evidence of selective enforcement, the Court disagrees. Calling about a blocked driveway is markedly different from calling about an assault, and thus does not show Bagley and Laputka were similarly situated when they called the police. *See Harvard*, 973 F.3d at 205 (explaining persons are similarly situated when they are alike "in all relevant aspects").

complaints in a variety of ways. Specifically, the UDPD told Laputka to (1) stop yelling at Bagley and his family "numerous times," (2) turn off his truck headlights which were pointed at Bagley's backyard, (3) stop parking illegally and blocking Bagley's driveway, and (4) remove a sign referring to Bagley as a "DICK." UDPD Incident Reps. 1-2, 4, 6, 9, 15. The UDPD also issued parking citations and one harassment citation (separate from the physical altercation citation) to Laputka based on Bagley's complaints. *Id*. at 10, 31. The breadth and frequency of the UDPD's responses—most of which were aimed at Laputka—contradict Bagley's assertion of being ignored. And Bagley provides no evidence these responses were influenced by his race. Ultimately, none of the Laputka-related incidents suggest any selective enforcement by the UDPD.[7]

Bagley also claims Upper Darby selectively enforced its codes against him but not his Caucasian neighbors. Pl.'s Opp'n Summ. J. 10. Bagley first asserts the Upper Darby Zoning Hearing Board immediately forced him to remove the tarp on his backyard fence because it

---

[7] Bagley's deposition discusses two other incidents with Laputka's dog on unspecified dates. The first occurred soon after Laputka moved in, and involved his dog chasing Bagley's wife. Pl.'s Dep. 58:16-62:25. Bagley claims after the police responded, they showed a bias towards him when they asked why Bagley had stepped outside of his fence if he was afraid of Laputka's dog. *Id*. 61:3-62:2. Because Bagley does not show a similarly situated person was treated differently and fails to explain how the police's reaction was based on his race, the Court concludes it is not a genuine dispute. In the second dog incident, Bagley contends Laputka threatened to kill him after allowing his dog to charge Bagley, forcing Bagley to shoot a paintball gun at the dog and Laputka. Pl.'s Statement Facts ¶ 16. Bagley cannot recall when this second incident occurred, and it may have occurred after he filed this case. *See* Def.'s Mem. Law 5. Nonetheless, the parties agree Bagley received a citation, which was later dismissed, while Laputka was arrested. Def.'s Statement Facts ¶ 17. Laputka's charges were still pending at the time of Bagley's deposition. *Id*. ¶ 18. This incident does not show selective enforcement: Laputka received a harsher punishment, Bagley fails to explain how race (rather than his shooting) resulted in his citation, and he provides no evidence of a similarly situated person being treated differently.

Upper Darby also provided reports of incidents occurring after Bagley commenced this action. *See* UDPD Incident Reps. 36-41. These incidents only resulted in citations for Bagley's neighbors—not Bagley. *See id*. at 38-39.

blocked a neighbor's view of the road, while Laputka was not forced to remove a tree from his yard that similarly blocked view of the road. SAC ¶¶ 44-46; Pl.'s Dep. 144:6-14; Pl.'s Statement Facts ¶ 21. Yet Bagley concedes Upper Darby did not force him to "remove" the tarp, but instead granted him a variance to modify the tarp to provide view of the road. Pl.'s Statement Facts ¶ 25. More importantly, there is no evidence beyond Bagley's conclusory allegations that Laputka had a tree which obstructed view of the road. The Court therefore concludes there is no genuine dispute as to whether a similarly situated person was treated differently with respect to code enforcement.[8]

Bagley also points to comments from Sean, an Upper Darby code enforcement officer who implied "Bagley was from a poor area because he was Black." SAC ¶ 48. Bagley views Sean's comment as evidence of "the ingrained bias and racism in the handling of [Upper Darby's] community relations." *Id.* ¶ 47. As an initial matter, Bagley does not identify Sean's role in any incident. There is no evidence Sean made any decision affecting Bagley. Bagley only asserts they had one conversation about Bagley's neighbor problems, during which Sean said he understood Bagley's situation because he previously lived in low-income housing. *Id.* ¶¶ 47-48. And there is no evidence Sean's comment stemmed from any Upper Darby policy or custom. Indeed, this comment is the sole race-related comment attributed to an Upper Darby employee in the record. While evidence of racially animus statements is not required to bring a selective enforcement claim, Bagley admits there was no other instance of a code enforcement officer treating him unfairly or with bias. Pl.'s Dep. 84:14-22. A single comment about Sean's personal experience is not evidence of a "widespread discriminatory practice[]" in Upper Darby's community relations.

---

[8] Bagley also alleged Upper Darby forced him to "pay for a land survey to confirm his fence's location" while his neighbors could violate "property and sanitation rules with impunity." SAC ¶ 41. He later conceded he never had to pay for a survey. Pl.'s Statement Facts ¶ 23.

10

*Monell*, 436 U.S. at 691 (citation omitted). Sean's comment, like the other incidents Bagley points to, is therefore insufficient to sustain a selective enforcement claim.

Bagley has not provided any evidence of unequal treatment on the basis of race. Nevertheless, the Court will address Bagley's reliance on *Hassan v. City of New York*, 804 F.3d 277 (3d Cir. 2015), in opposing summary judgment. As an initial matter, *Hassan* reviewed a motion to dismiss—the Court applies a distinct summary judgment standard here. *See Hassan*, 804 F.3d at 288-89. And Bagley merely cites *Hassan* while reciting inaccurate allegations and failing to cite any record evidence.[9] Bagley's response in opposition is otherwise insufficient, as it fails to offer evidence of any similarly situated person being treated differently than Bagley.

Bagley has failed to provide any evidence which would allow a reasonable factfinder to conclude Upper Darby treated him differently than others similarly situated because he is African American. In the absence of a constitutional violation, Bagley's *Monell* claim necessarily fails. Accordingly, Upper Darby's motion for summary judgment will be granted in full.

An appropriate Order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.

---

[9] For example, Bagley's response asserts Laputka "has not been issued citations" due to Upper Darby's "inaction," while "only [Bagley] has faced punitive measures." Pl.'s Opp'n Summ. J. 8-10. But as discussed, Bagley concedes Upper Darby repeatedly responded to his complaints and issued several citations to Laputka. Bagley also inaccurately claims Upper Darby provided no recourse, *id*. at 11-12, though the UDPD advised Bagley of his "options to file a private criminal complaint for harassment and a civil suit" and gave him the Ethnic Intimidation Unit phone number, UDPD Incident Reps. 6; *see also* Pl.'s Dep. 193:2-15.